JACINTO LOPEZ LABORDE ET AL.

*v.*

FRANCISCA LUISA LABORDE ET AL.

San Juan, Law, No. 386.

and

JOSÉ MARÍA UBARRI

*v.*

PABLO UBARRI ET AL.

Equity, No. 407.

---

1. A person born in Porto Rico and resident here when the peace protocol was signed, but who removed to Spain before the treaty of peace was proclaimed, returning to Porto Rico less than a year thereafter, and who remained here several months, and then returned to Spain for a year or more, and was domiciled there, holding a "cédula personal" of the municipality wherein domiciled, but who swears that during all of said time his intention was to be a citizen of Porto Rico, is such still.
2. "Cédulas personales" issued by Spanish municipalities to persons domiciled therein do not necessarily imply Spanish citizenship.

Order filed April 2, 1907.

---

*Willis Sweet, Esq., Henry F. Hord, Esq.,* and *Damian Monserrat, Esq.,* attorneys for plaintiffs.

Laborde v. Laborde.

*Francis H. Dexter, Esq.,* attorney for defendants.

RODEY, Judge, delivered the following opinion:

These two suits involve the same contention, and, by consent of counsel for both parties, are considered together. The question is raised by a verified motion made in each case, in behalf of defendant and respondent, Rufino Ubarri Yramategui, to dismiss the declaration in the suit at law and the bill in the suit in equity for want of jurisdiction. Said defendant and respondent alleges that he is a Porto Rican, and that, all of the plaintiffs and complainants being also Porto Ricans, the cases come within the exclusion rule laid down in the Vallecillo-Bertran Case heretofore decided by this court.

The unfortunate wording of § 3 of the act of Congress (31 Stat. at L. 953, chap. 812) approved March 2, 1901, amending the Foraker act, which declares that the jurisdiction of this court shall "extend to and embrace controversies where the parties or either of them are citizens of the United States or citizens or subjects of a foreign state or states," is causing this court a lot of trouble and annoyance. The neglect of the recent Congress to amend this act, as requested by the bar of the island, but adds to the difficulty. Hardly a case can arise but what Porto Ricans will be found to be necessary parties on both sides, and hence usually the jurisdiction is found to be in the local courts, which all counsel contend, whether with or without reason, afford no proper equitable remedy in such cases. This condition of things results in an almost continuous effort to dispense with all save absolutely necessary parties, so as to cure jurisdictional requirements, and the efforts to claim or disclaim Spanish or Porto Rican citizenship, either to assert

Laborde v. Laborde.

equitable rights, or avoid liability, is continuous, embarrassing, and annoying. However, until Congress sees fit to act in the premises, we must consider the question referred to as *stare decisis;* our decision of the matter was made advisedly, after full hearing, and we see no reason to change it. Courts do not make law (or at least ought not); their duty is to administer it as they find it to be.

We have also heretofore ruled in another branch of one of these same cases, that this court is not vested in plain proceedings *in rem,* with power to acquire jurisdiction by means of substitute service based upon what is known as a "foreign attachment." In the decision making this holding, we took occasion to set forth the necessity for additional legislation in that regard. It transpires, as we then stated, that after the American occupation of this island, many Spaniards who, as it is said, through influence or by direct frauds and otherwise, had done great wrongs to people on the island, immediately left for Spain and have ever since continued to reside there without any power existing in this court to bring them to account for their fraudulent doings while here, although they are possessed in many cases of large amounts of property in the island, from which they are continually receiving revenue. These conditions, in a manner, excuse the efforts that are being made, as above stated, to right these wrongs, and certainly are sufficient reason in themselves as an argument for additional legislation by Congress.

While considering this matter, it may not be amiss to call attention to the fact that it is probably no part of our duty to resolve doubts in favor of our jurisdiction. As the court is of limited jurisdiction, the contrary should be the rule. Neither do we think that this tribunal was instituted to af-

Laborde v. Laborde.

ford expectant litigants an easy mode of uprooting proceedings, decisions, and titles that were settled long years ago, under Spanish sovereignty, through what was then, prima facie, at least, due process of law, in the Spanish courts, or that it ought, without the fullest showing and the gravest reasons, to attempt to do so. On this subject it may be well to hark back to a warning statement made by the Supreme Court of the United States in 1898, in Cessna v. United States, 169 U. S. 165, 42 L. ed. 702, 18 Sup. Ct. Rep. 304, where an effort was made to induce the courts of the United States to correct a wrong claimed to have been done previous to the treaty of cession between the countries, by the Mexican government regarding lands now situated within the boundaries of the United States. Mr. Justice Brewer in that opinion used this language: "It is the duty of a nation receiving a cession of territory to respect all rights of property as those rights were recognized by the nation making the cession; but it is no part of its duty to right the wrongs which the grantor nation may have theretofore committed upon every individual. There may be an exception when the dispossession and wrong of the grantor nation were so recently before the cession that the individual may not have had time to appeal to the courts or authorities of that nation for redress. In such a case, perhaps, the duty will rest upon the grantee nation; but such possible exception has no application to the present case and in no manner abridges the general rule that among the burdens assumed by the nation receiving the cession is not the obligation to right wrongs which have for many years theretofore been persisted in by the grantor nation."

While this language of the Supreme Court was used with reference to wrongs of the former government against its own

Laborde v. Laborde.

then citizens, we think it is equally applicable to all stale demands which were settled by the courts of the former sovereignty, and in which plenty of time had elapsed before the change, in which the injured parties could have made an effort to obtain relief. In our opinion, neither international law, the comity of sovereign states, nor the treaty between this country and Spain, requires or even contemplates that the new sovereign shall expend money or the time of its courts in such work, save in the exceptional instances pointed out by the Supreme Court, supra, and perhaps some few others, in which exist such surrounding facts and circumstances as to call for such intervention.

In one of these cases now being considered, an examination of the files shows that it arose out of an alleged defrauding of an estate which one Jacinto Lopez y Martinez left in the year 1884, fifteen years before the change of sovereignty. The chief wrongdoer, according to the allegations of the declaration, was one Pablo Ubarri y Capetillo, the father of this present defendant and mover, who, it seems, was a very influential and powerful person of title here at the time, and who, if the allegations of the bill are true, procured the widow of the deceased to make him manager of the whole vast estate, said to have been worth about a quarter of a million dollars. He proceeded by his agents to divide it in the proper surrogate or probate courts, or at least the courts which had such jurisdiction here at the time, and it seems, because the widow, who was presumably an independent person and of full age, refused to pay a large claim of his against the estate, brought a suit against her and all the infant heirs for the collection of it, and supplemented it by an attachment. He then, as it is said, for several years neglected the payment of the taxes, and had the different municipalities

II. PORTO RICO.—32.

in which the land of the estate was situated, distrain for it,
then had the land undervalued through his own minions, and,
on the sale, bought it in, either himself directly or through his
agents, until finally, in 1889, he became possessed, for a tri-
fling sum, of practically the entire estate, and in the meantime
had the widow incarcerated under a prosecution for cutting
some wood on one of the estates, and secured the affirmance of
the imprisonment by a higher court after a lower court released
her; from which imprisonment she was only at last released by
a royal order from Spain.   The whole transaction appears to
have been a most outrageous fraud and crime, if the complaint
is true, yet this adult woman stood by and took no steps to
prevent it before the Spanish courts, or, if she did and failed,
she is simply now asking the courts of a new government for
a new trial.   It must be remembered that all of this occurred
nine or ten years before Gen. Miles landed at Guanica.   As an
excuse for the delay, it was stated on one of the hearings that
this man, Pablo Ubarri y Capetillo, had such influence that he
was enabled to dominate the action of the government and of
the courts, and that it would have been a useless task for this
lone widow to attack him.   The equity suit being considered
here is by one of this man's sons against this defendant and
mover and another brother, alleging that, after the death of
their mother, others of the heirs, including this respondent,
conspired with their said father and cheated and defrauded
complainant and the other heirs out of a large amount of the
estate,—which consisted presumably to some considerable ex-
tent, of the ill-gotten community gains made out of the Jacinto
Lopez estate, as set out in the suit at law.   The father died
in 1894, and, of course, having borne a title, and having been
such an influential citizen, his sons and family were naturally

Laborde v. Laborde.

close adherents of the Spanish government, and it appears that the mover here, Rufino Ubarri, was a Spanish volunteer who took part in defending the country against the American troops in the late war, and that immediately after the war most of the family moved to Spain. Of course we do not know what the truth of all these allegations as to the fraudulent conduct of this father and his sons may be, and we make the statement only to show the sort of allegations that have been, and are continuing to be, made in complaints and bills before this court at the present time, and for the purpose of showing some of the ulterior facts, and large amount involved in this bitter contest, for that is what it has developed into.

The question for determination is: On the facts and the law here to be stated, is Rufino Ubarri a Porto Rican or a Spanish subject? If he is a Porto Rican, as he claims to be, we have no jurisdiction in either of these cases; if he is a Spaniard, as the other side allege him to be, then his motion must be over-ruled and he be required to further plead, answer, or demur.

The suit at law was filed June 6, 1906; the defendant Rufino Ubarri thereafter, on June 16th, stipulated with the other side for additional time in which to plead. On June 30th he demurred, on the ground that the action was prescribed under several different local statutes which he cited. On September 17th he again stipulated, extending the time within which to answer. Again, on November 3d, he stipulated, extending the time to plead, and repeated it on November 30th, and then on December 27th he filed this motion to dismiss, alleging for the first time his Porto Rican status or citizenship. About the same course of stipulating for time, etc., took place, so far as he is concerned, in the equity suit, the bill in which was filed August 29, 1906. During the time of this dilatory action, the

effect of the ruling in the Vallecillo y Mandry v. Bertran Case, ante, p. 46, became known, and was taken advantage of by others in these same suits.

In his motion he alleges that he was born in the island of Porto Rico in 1861, and now resides here, and that he has always lived here, with the exception of the time he went to Spain to be educated and divers visits he made to that country since; that desiring and intending to be and remain a citizen of Porto Rico after the American occupation, and after the signing of the treaty of peace between Spain and the United States of America, he refrained from making, before a court of record or before any other tribunal or consulate within a year from the date of the exchange of ratifications of the treaty of peace, as provided therein, a declaration of his intention to preserve his allegiance to the Crown of Spain. And that in default of such action he has renounced his allegiance and adopted the nationality of the territory of Porto Rico in which he resides, and became, and is, under the said treaty and the laws of the United States, a citizen of Porto Rico. To all of which he makes oath. He was required to support this motion by other proof, and on January 4th of the present year, counsel for both sides in both suits being present in open court, a full hearing on the matter was had. A considerable amount of oral evidence was taken in the premises, all of which was afterwards written out by the stenographer and has been carefully reread before proceeding with the writing of this opinion.

Before stating or discussing the acts and doings of this defendant, which it is claimed make him, or rather keep him, a Spanish subject, we will proceed to consider the law on the subject.

The treaty of Paris was signed on December 10, 1898; the

ratifications thereof were exchanged at Washington on April 11, 1899. Article 9 of the treaty is applicable, and, among other things, provides that:

"Spanish subjects, natives of the Peninsula, residing in the territory over which Spain, by the present treaty, relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining, in either event, all their rights of property, including the right to sell or dispose of such property or of its proceeds; . . . In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside." [30 Stat. at L. 1759.]

Section 7 of the organic act (the Foraker act, establishing civil government in Porto Rico, approved April 12, 1900, 31 Stat. at L. 77, chap. 191) provides: "That all inhabitants continuing to reside therein [in Porto Rico] who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain on or before the eleventh day of April, nineteen hundred, in accordance with the provisions of the treaty of peace between the United States and Spain entered into on the eleventh day of April, eighteen hundred and ninety-nine."

Counsel for the mover strenuously contends that, in view of

the provisions of the treaty thus set out, he cannot understand how an argument can be made in opposition to the motion; that, according to the treaty, the right of preserving Spanish citizenship or nationality was given only to "Spanish subjects natives of the Peninsula;" that Rufino Ubarri is not a "native of the Peninsula," and was more than twenty-one years of age on April 11, 1899, and that therefore he could not have elected to preserve his Spanish nationality in accordance with the above quoted portion of art. 9 of the treaty, even though he had desired so to do. He further contends that, under the language of the organic act aforesaid, the mover, Rufino Ubarri, was an inhabitant of Porto Rico and continued to reside therein, and is still a resident thereof.

There probably could not be much dispute as to this contention, were it not for the fact that Rufino Ubarri was not in Porto Rico on the day of the ratification of the treaty. It developed at the hearing that on March 8, 1899, about three months after the signing of the treaty and one month and three days before the ratification of it, this defendant took his family and went to Spain, remaining there about six months, and returning to Porto Rico in the fall (October 22d) of that year, and again going back with his family to Spain on June 18th of the following year, A. D. 1900, remaining there this second time something like two years. He left his furniture stored at his father-in-law's here at the time, and took only a small amount of expense money with him, having more remitted to him from time to time. He purchased no return tickets on either trip, although the evidence shows he might have saved 25 per cent of his passage money on the two and a half tickets he had to buy in each instance for himself, his wife and two children, and such tickets would have been good for a year and could

Laborde v. Laborde.

have been extended for a longer period. This point, coupled with his high connections and natural Spanish tendencies, is made much of by counsel for complainants as showing his intention to cast his lot with Spain after the war.

Respondent himself testified in his own behalf at the hearing. The court saw him and heard him testify, and at times took him in hand with a view to getting some information from him. He appears to be a sort of nervous, somewhat hypochondriacal individual, of a not very complacent or high order of intellect. In fact, his counsel during the examination, with reference to him, stated: "The witness is not very bright, although I am not willing to say that he is not entitled to all credibility as a witness." He testified, among other things, that he was a member of the guerrillas, meaning, as it is claimed, that he had been a member of the Spanish volunteer forces here in the island of Porto Rico who fought against the American troops. He further testified that when he took this trip to Spain, some three months after the signing of the treaty of peace, he went purely on a pleasure trip, and incidentally for the benefit of the health of one of his children. The delicate health of this child was fully shown by the evidence of a physician on the hearing. And that, inasmuch as he has property interests here in Porto Rico, and none elsewhere, he could not reside in Spain all the time if he wanted to. When first asked what his intention since the war between the United States and Spain has been with respect to his own citizenship, he answered: "That I cannot tell you; that I reserve to myself; that I will keep to myself." He testified further that he had a poor memory and therefore he had forgotten to tell about coming back from Spain a few months after he went there the first time, which fact was only brought out by the evidence of other

Laborde v. Laborde.

witnesses. During the examination, his counsel had to warn him that, "this is a serious matter," and that he must not give any kind of an answer, but before he answers must know what he is answering. In answer to the court as to how long he stayed in Spain on those two trips, he said: "I might have stayed two or three years, but always with the idea of coming back, with the intention of returning to Porto Rico. You know that the property has great demand upon people, and, as they say, the attention of the master fattens the horse." It developed in the evidence that he took out what is called a "cédula personal" while he was in Spain, but he claimed that the only effect of this was to enable him to get a passport and come back to Porto Rico whenever he wanted to, and that it in no manner indicated any desire on his part to remain a Spanish citizen; that he got it for himself alone, and not for his wife and children He stated positively in answer to his counsel as to whether it was his desire to remain a Spaniard: "No, sir; neither is it my wish or desire to do so, nor will I ever serve in their army again," or words to that effect.

In the course of the hearing there was introduced a certificate from the Spanish consul of San Juan, dated the 17th day of December, 1906, to the effect that the books or registry of Spanish subjects in his office do not show that defendant Rufino Ubarri is inscribed therein as such. It is pointed out that respondent Ubarri was here in Porto Rico from October 22, 1899, to April 11, 1900, a period of nearly six months of the year from April 11, 1899, to April 11, 1900, during which the option given in the treaty was running to permit persons to elect to remain Spanish subjects, and during which time he could have so inscribed himself as a Spanish subject in the consulate had he desired to. Counsel for the other side objected to this,

because, they claim, under the treaty it must have been made before a court of record, to which counsel for mover replies that the Spanish text of the treaty, which is of equal binding force with the English text, uses the phrase, "oficina de registro" instead of "court of record," and claimed therefore that a registry in a consulate would be sufficient under the treaty.

A mass of evidence was introduced attempting to show what Rufino Ubarri did and said previous to leaving on these trips for Spain. We have examined all of it carefully, and can say that most of it is immaterial and hearsay and opinions. There is nothing in any of it that would induce anybody to believe that the mover had really declared his intention before going to Spain, to remain there permanently and retain his Spanish citizenship. He has testified himself that he never declared his intention before any court or at any consulate, or before any other official whatever, to retain such Spanish citizenship. When recalled, toward the end of the hearing, he testified again: "My intention has been, and still is, to be an American citizen, a citizen of the United States; because if, in the near future, I should get the idea of going back to Spain, I want to be considered an American citizen, because I am looked at under a better light as a foreigner than as a Spaniard." He further testified that he wants his children to be American citizens and that he sent them to the United States to school for two years in order to learn the language; that both he, his wife, and his children are native Porto Ricans, and their tendency is to live in their native land. He was very positive about all this, and states that it has been his intention to remain a Porto Rican and to become an American citizen, if he can, ever since 1898, when the war ceased.

There is a dispute between the respective counsel as to the

effect of these cédulas personales. Counsel for the mover claimed that they are given to visitors temporarily in Spain for identification, tax, contract, and permission to sue purposes, and cites law in support of this view, while counsel for complainants claimed that they are given to no person not domiciled in, and a citizen of, Spain, and also cites Spanish law which he claims supports this contention. The citations given us from vols. 4, 5, and 6 Alcubilla lead us to adopt the view that the cédulas do not necessarily imply citizenship, and that is what is material here.

It is in evidence that all this Ubarri family, except the mover here and José María, another brother, are now living in Spain. Several of the witnesses stated that this man, Rufino Ubarri, during the transition period here on the island, talked as a Spaniard and acted as one, and that it was natural for him to do so, being the son of a titled Spanish father. It is also in evidence that the mover has served on juries in the local courts here in Porto Rico within the last two or three years.

We are unable to do so and it is useless for us to try to reason it away, because it appears to be and without doubt is good law, that, under the treaty of Paris, any plaintiff in this court who alleges that an adult native Porto Rican, no matter what his parentage may be, is now still a Spaniard, has the whole burden on him to show that fact. The presumption under the treaty and the law is that he is a citizen of Porto Rico. The then Attorney General of the United States, Hon. P. C. Knox, now United States Senator from Pennsylvania, held, on May 13, 1902 (24 Ops. Atty. Gen. page 40), as per the syllabus, that: "A native Porto Rican, an artist by profession, although temporarily living in France on the 11th day of April, 1899, is, under § 7 of the act of April 12, 1900, a citizen of Porto Rico,

Laborde v. Laborde.

and, as such is an American artist, whose paintings, upon importation into the United States, are entitled to the privileges provided in paragraph 703 of the tariff act of July 24, 1897," etc. Mr. Knox further states with reference to this artist, a Mr. Molinas, "that even though he could be held to be omitted from § 7 of the organic act, he is undoubtedly one of those persons turned over to the United States by article 9 of the treaty to belong to our nationality. He is also clearly a Porto Rican; that is to say, a permanent inhabitant of that island, which was turned over by Spain to the United States." This language of the Attorney General is quoted with evident approval by the Supreme Court of the United States in Gonzales v. Williams, 192 U. S. 15, 48 L. ed. 322, 24 Sup. Ct. Rep. 177, where it was sought to subject a Porto Rican citizen to the restrictions of the immigration laws against aliens.

Gov. Magoon, in his work, "The Law of Civil Government under Military Occupation," pages 175, 176, comments at length on this article 9 of the treaty, and after stating that such instruments usually contain stipulations intended to protect the civil and political rights of the inhabitants in the ceded country, says that Spain did not insist on such provisions in the treaty of Paris, but trusted to the justice and generosity of the sovereign people of the United States; and hence the provision that the civil rights and political status of the native inhabitants, etc., should be determined by Congress, was inserted therein. Then he continues: "The United States recognized the right of said inhabitants to continue in allegiance to the Crown of Spain or to confer their permanent allegiance upon the United States. It therefore became necessary to adopt a test or rule of evidence whereby might be ascertained which course the individual inhabitants had elected to pursue. Hence the provisions of article 9 of

the treaty: 'In case they remain in the territory, they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.' This provision of the treaty simply declares the ordinary rule that allegiance is presumed from the fact of residence in the country and participation in the protection and other benefits of organized government." Then he quotes, in further support of his view, at length from Halleck on International Law.

We do not think that the provisions of the royal decree of Spain of May 11, 1901, providing how Spanish citizens who lost their citizenship under the treaty of Paris might recover it in Spain, has any bearing on the case we are considering here, because, in the first place, if it conflicts with the treaty in any way, it would not be binding on the government of the United States. Magoon, Law of Civil Government under Military Occupation, p. 173. And further, article 2 of that decree, which is the only one that can fairly be said to be applicable, provides that: "Natives of the territories ceded or relinquished, who, at the date of the exchange of ratifications of the treaty, of the 10th of December, 1898, as aforesaid, were residing outside of the country of their birth, and who, at the time of the promulgation of this decree, are found to be inscribed in the registers of the legations or consulates of Spain abroad, or who were holding public office under the Spanish administration, or who were domiciled within the actual dominions of Spain, shall be held to have retained their Spanish citizenship unless, within the period of a year from this date, they shall make an express declaration

to the contrary before the proper authorities." [3 Moore, International Law Dig. p. 323.]

As stated, we do not think this article conflicts with the phrase in article 9 of the treaty, "Spanish subjects, natives of the Peninsula," but if it does, it would be null and void as to this mover. Magoon, supra; also 3 Moore, International Law Dig. p. 327. This latter work, same volume, p. 308, states: "To hold that the mere residence of an individual in a foreign country was conclusive evidence of his desire and intention to become one of its citizens would, declared Mr. Blaine, involve an assumption of a most violent character."

We fully appreciate the position this mover was in when he went to Spain before the ratification of the treaty. Nobody knew the treaty would be ratified so soon, but all expected it any day. After it was ratified, every Porto Rican of importance knew its terms. The military commander of the island issued a general order explaining how those entitled to preserve their Spanish allegiance could do so. This mover same back to Porto Rico and remained here six months, during all of which time he might have preserved his Spanish citizenship, and he knew, during all this time, that if he did not do so, he would be presumed to be a Porto Rican. He was here with his entire family during those six months.

For the purposes of this motion, as we view the law, it is immaterial whether this man is in his heart loyal to the American flag. He swears that he is loyal to his native land, Porto Rico, and that he wants to become an American citizen, and we think he has a right under the treaty and under the organic act to be a Porto Rican, owing allegiance to the United States. If he is a Porto Rican, of course his motion must be sustained here. We have nothing to do with his inner feelings. That is matter for

another department or another proceeding. The treaty of Paris no doubt did not instantly make patriotic Americans out of every native Porto Rican it brought under the flag, but it did, we think, make them adopt "the nationality of the territory in which they reside."

We are inclined to think that this mover having been born here in Porto Rico, and not being, "a native of the Peninsula," could not remain a Spanish subject if he wanted to, even by registering himself as provided in the treaty, at least up to the time of the passage of the organic act. If it can be held that § 7 of the organic act contemplated the ratification of the election of individuals, native Porto Ricans, to remain Spaniards, if such election was made within the year next after the ratification of the treaty, then that is answered by the fact that this mover did not make any such election, although he was here for fully six months of that year, and he comes here in open court and testifies under oath that it has never been his intention to abandon his Porto Rican citizenship. Of he really went to Spain in good faith, for pleasure, and for the benefit of his child's health, it was, under the circumstances, the most natural place for him to go, where everybody spoke his mother tongue. If he had gone to England, France, Italy, or any other country, no one would claim that such fact made him cease to be a Porto Rican, or made him a citizen of such other country. The burden is entirely upon plaintiffs here to show, by a preponderance of the evidence, that he did so; and they cannot, in the face of the treaty and statute, ask the court to hold him to be a Spaniard, without making such showing to the court. He is a Porto Rican as the law presumes he is, until the contrary is conclusively shown. What his neighbors may testify about his intention, or what opinion they may give as to their beliefs, is not binding on

Laborde v. Laborde.

him, and anyway, none of them did so testify in any manner that could be received, as we heard it. He was in a peculiar situation. He was the son of a titled Spaniard. He fought for his country until it was conquered. Naturally, everybody would believe his sympathies to be with Spain; and if, as he swears he made up his mind, after it was all over, to accept the inevitable, he has a right to have his oath, in connection with the law, considered in that regard. It makes no difference about his Spanish connections or the status of the rest of his relatives. Their cases are not now being considered. They are not here in person claiming to be Porto Ricans. Many good American citizens in all the states have near relatives in their fatherland. The circumstances surrounding the conquest of Porto Rico were peculiar. This man never moved any of his means to Spain, never made any investments there, never owned a residence there, and is now, as he always has been, a resident in Porto Rico, claiming to be a citizen thereof.

We give due weight to the fact that his counsel did not immediately plead that he was a Porto Rican on the filing of these suits against him, and probably did not do so because his client did not authorize it, or was not yet ready to speak on the subject; but now that he has spoken, and spoken positively, and under oath, and he being a resident here in Porto Rico and all his property and interests being here, as well as his family, and all being natives to the manor born of the island, due weight must be given to such fact. We do not consider it profitable to review the many domestic and Spanish citations in the briefs of counsel on both sides as to domicil and residence. Neither one would necessarily imply citizenship; 3 Moore, International Law Dig. p. 274; and further, because there is little room for dispute under the authorities on those subjects, the main ques-

tion being always one of intent, the law fixes nationality, and this defendant had a right, on and after April 11, 1899, wherever he was, to decide and elect as to this matter. We do not think that it has been proved by any proper evidence, much less by a preponderance of the evidence, that he ever in fact permanently changed his domicil. The declaration of the party himself has great weight in the matter of domicil, as instance the case of the patriot Kosciusko; his "domicil of origin was Lithuania, in Poland. The presumption of the law is that it was retained unless the change is proved, and the burden of proving it is upon him who alleges the change." Somerville v. Somerville, 5 Ves. Jr. 787; 3 Moore, International Law Dig. p. 814. It is difficult to lay down any general rule as to what residence constitutes domicil. There must be an actual residence in the place, with the intention that it is to be a principal and permanent residence; the intention of the party may be gathered from the seat of his fortune, his family, and pursuits in life. A removal from the former domicil for an indefinite and uncertain time is not a change of it. Id. (Moore).

This defendant's legal rights are superior to the mere inclination or desire of the court or counsel to keep him in court by resolving the doubts, if there are any, against him. It is a serious thing for a court, under circumstances like these, to force a man to belong to a country that has ceded both him and the land of his birth away, and which citizenship he swears he neither claims nor desires. On the facts here we have no power to do so. If he is sincere in his claim, and the burden is on the other side to show the contrary, it would simply be a judicial outrage. The remedy is with Congress to enable this court to dispossess him of property he may have acquired through the wrong of his father, if such is the fact, which, it is intimated, in truth and justice,

Laborde v. Laborde.

belongs to other citizens of this island; but, on the merits of that, we express no opinion. When Congress created this court, it limited its jurisdiction, and presumed that the local courts had jurisdiction that would be ample, concurrent or exclusive, the same as in the states. It is regrettable if the local courts, as it is said, afford no proper remedy in such a case, but we cannot expatriate this man to please litigants.

It may be, and probably is, true, that this mover did not make up his mind as to the matter of his citizenship at the time he first left Porto Rico with his family, on March 8, 1899. As matter of law, he did not have to do so at that time. The treaty had not yet been ratified. He had until the 11th day of April, 1900, more than a year thereafter, in which to do so. He came here to Porto Rico on October 22, 1899, and remained until June 18th of the year following, any day of which time up to April 11th he might have declared his intention to remain a Spaniard, yet, with full knowledge of the consequences, he did not do so. The privilege of being a mere Porto Rican, owing allegiance to, without being a citizen of, the United States, is not one that the court can be induced, just to meet mere exigencies in any case, to deprive him of.

The motion in each case, therefore, will be sustained, and the complaint in No. 386 dismissed at once as to this defendant only, and unless the bill in No. 407 can be and is amended within five days so as to give this court jurisdiction, it will stand dismissed with costs, and it is so ordered.